513 So.2d 691 (1987)
SAGA BAY PROPERTY OWNERS ASSOCIATION, a Florida Corporation, and Saga Development Corporation, Inc., a Foreign Corporation, Appellants,
v.
Donald J. ASKEW, As Personal Representative of the Estate of David A. Askew, and Surviving Father, and Linda Askew, As Surviving Mother of David A. Askew, a Minor, Deceased, Appellees.
No. 85-1945.
District Court of Appeal of Florida, Third District.
September 8, 1987.
Rehearing Denied October 26, 1987.
*692 Daniels & Hicks and Ralph O. Anderson, Miami, for appellants.
Segall & Gold and Norman S. Segall, Coral Gables, for appellees.
Before BASKIN and DANIEL S. PEARSON and FERGUSON, JJ.
DANIEL S. PEARSON, Judge.
This is an appeal from a judgment against Saga Bay Property Owners Association, Inc.,[1] entered upon a jury verdict finding that the Association was substantially responsible for the drowning death of the six-year-old son of Donald and Linda Askew.[2] Although the appellant asserts error ranging from the exclusion of defense evidence to the denial of its remittitur motion, the need to discuss these points is obviated by our conclusion that there is merit in its claim that it was entitled to a directed verdict, and thus a judgment of no liability in its favor.
David Askew was six years old at the time of his death. He required constant supervision because he was brain-damaged at birth and suffered from psychomotor retardation and myoclonic seizure disorder. On the day of the drowning, David was outside with his father, who was washing the family cars. David, who could not swim, wandered away unobserved.
The scene of this tragic accident was an artificial lake near the Askew home in the Saga Bay residential development. One side of the lake was developed into a sandy beach, which was used by the residents and general public for recreational swimming, boating, and fishing. The other side of the lake  where David entered and drowned  was undeveloped. The bottom of the lake, consisting of rock and mud, and containing typical aquatic plant life and some construction debris, dropped off to a depth of 45 feet at approximately 40 to 60 feet from shore. There were no fences or warning signs on the undeveloped side of the lake. David's was the very first drowning in the lake.
The fundamental proposition that drowning is a risk inherent in any body of water leads to some equally fundamental legal principles. The owner of a body of water is not liable merely because a child may be too young or of insufficient intelligence to understand the open and obvious danger of the water; the responsibility for the care of such children remains with their parents and caretakers. To shift the responsibility to the lake owner  by virtue of *693 ownership alone  is to unreasonably require the owner to fill the lake or fence it in order to guard against being held liable. Ochampaugh v. City of Seattle, 91 Wash.2d 514, 588 P.2d 1351 (1979); Loney v. McPhillips, 268 Or. 378, 521 P.2d 340 (1974); Cooper v. Diesel Service, Inc., 254 Ark. 743, 496 S.W.2d 383 (1973). An owner of a natural or artificial body of water has no duty to fence it. See Walters v. Greenglade Villas Homeowners Association, 399 So.2d 538 (Fla. 3d DCA 1981), and cases cited therein; compare Machin v. Royale Green Condominium Association, 507 So.2d 646 (Fla. 3d DCA 1987) (swimming pool lacked self-closing gate). Likewise, an owner has no duty to post guards or signs in areas not designated for swimming. Cooper v. Diesel Service, Inc., 496 S.W.2d at 386; compare Avallone v. Board of County Commissioners, 493 So.2d 1002 (Fla.), on remand, 497 So.2d 934 (Fla. 5th DCA 1986) (failure to provide supervisory personnel at county-owned and operated swimming facility); Cutler v. City of Jacksonville Beach, 489 So.2d 126 (Fla. 1st DCA 1986) (inadequate supervision by lifeguards at swimming facility); Brevard County v. Jacks, 238 So.2d 156 (Fla. 4th DCA 1970) (duty to keep swimming facility in a reasonably safe condition).[3] In sum, then, the law has long recognized that:
"The world cannot be made dangerproof  especially to children. To require all natural or artificial streams or ponds so located as to endanger the safety of children to be fenced or guarded would in the ordinary settled community practically include all streams and ponds, be they in public parks or upon private soil, for children are self-constituted licensees, if not trespassers, everywhere. And to construct a boy-proof fence at a reasonable cost would tax the inventive genius of an Edison."[4]

Emond v. Kimberly-Clark Co., 159 Wis. 83, 88, 149 N.W. 760, 761 (1914).
Thus, there is no liability for a child's drowning in a body of water, natural or artificial, unless there is some unusual danger not generally existing in similar bodies of water or the water contains a dangerous condition constituting a trap. Allen v. William P. McDonald Corp., 42 So.2d 706 (Fla. 1949); Newby v. West Palm Beach Water Co., 47 So.2d 527 (Fla. 1950); Adler v. Copeland, 105 So.2d 594 (Fla. 3d DCA 1958); see Carmichael v. Little Rock Housing Authority, 227 Ark. 470, 299 S.W.2d 198 (1957) (artificial pond merely duplicates hazards existing in natural ponds); Plotzki v. Standard Oil Co., 228 Ind. 518, 92 N.E.2d 632 (1950) (same). In the present case, none of the conditions which the Askews contend were so dangerous to their child provide a basis for owner liability. The plant-life and debris found in the lake at Saga Bay were certainly not unusual. Hill v. City of Lakeland, 466 So.2d 1231 (Fla. 2d DCA 1985) (no duty to warn of naturally occurring aquatic weeds that caused boy to drown in city-owned lake); Ochampaugh v. City of Seattle, 91 Wash.2d 514, 588 P.2d 1351 (1979) (no liability even though pond had boggy edges and debris-laden bottom which abruptly dropped off on one side); Guillot v. Fisherman's Paradise, Inc., 437 So.2d 840 (La. 1983) (no liability for two-year-old's drowning even though pond's sides went straight down and surface covered with thick, green algae, trash and debris); Corcoran v. Village of Libertyville, 73 Ill.2d 316, 22 Ill. Dec. 701, 383 N.E.2d 177 (1978) (no liability where drainage ditch had deceptively steep slope, irregular embankment, an "unnaturally pocketed" bed causing excessive accumulation of water, rubbish and debris). The lake's sharp change in depth is characteristic of lakes and does not constitute a *694 concealed dangerous condition.[5]Kinya v. Lifter, Inc., 489 So.2d 92 (Fla. 3d DCA 1986) (artificial bank's slope not so different from natural bodies of water); Hendershot v. Kapok Tree Inn, Inc., 203 So.2d 628 (Fla. 3d DCA 1967) (sudden drop-off two feet from shore); Howard v. Atlantic Coast Line R.R. Co., 231 F.2d 592 (5th Cir.1956) (applying Florida law; straight sides do not constitute hidden danger); Cortes v. Nebraska, 191 Neb. 795, 218 N.W.2d 214 (1974) (public recognizes that bodies of water vary in depth and that sharp changes can be expected); Plotzki v. Standard Oil Co., 92 N.E.2d 632 (same). That on the opposite shore of the lake  so distant from the place at which young David drowned as to be "too far to walk," according to Mrs. Askew  there was, as is common, an area cleared and set aside for swimming, does not mean, as appellees contend, that a person may have an expectation which the law will recognize that all parts of the shore will be the same as the cleared and developed swimming beach.[6]See, e.g., Cooper v. Diesel Service, Inc., 496 S.W.2d at 384 (no liability for six-year-old's drowning even though gentle slopes on three sides of artificial pond might lead child to be unaware of fourth side's steep drop). There is no other evidence concerning the lake or the circumstances of the drowning.[7]
We are mindful, of course, that our decision adds further loss to the irreparable loss already suffered by the appellees. We are guided, however, by the observation made nearly a century ago:
"This is a case of exceedingly great hardship, and we have diligently, but in vain, sought for some tenable ground upon which the [appellees] could be relieved from the loss that [a reversal] of the decree appealed from will necessarily subject them to. But hard cases, it has often been said, almost always make bad law; and hence it is, in the end, far better that the established rules of law should be strictly applied, even though in particular instances serious loss may be thereby inflicted on some individuals, than that by subtle distinctions invented and resorted to solely to escape such consequences, long-settled and firmlyfixed doctrines should be shaken, questioned, confused or doubted. It is often difficult to resist the influence which a palpable hardship is calculated to exert; but a rigid adherence to fundamental principles at all times and a stern insensibility to the results which an unvarying enforcement of those principles may occasionally entail, are the surest, if not the only, means by which stability and certainty in the administration of the law may be secured."

Demuth v. Old Town Bank, 85 Md. 315, 319-20, 37 A. 266, 266 (1897) (citation omitted).
In our view, the evidence concerning the condition of the lake at Saga Bay simply does not support a verdict or judgment holding the Association liable for this tragic accident. Accordingly, the judgment for the appellees is reversed and the cause *695 remanded with directions to enter judgment for the appellant.
Reversed and remanded, with directions.
NOTES
[1] Suit was also brought against Saga Development Corporation. A default was entered against this defendant, but no judgment was entered thereon. Saga Development Corporation is not a party to this appeal.
[2] The jury returned a verdict in the amount of $1,300,000 ($650,000 to each parent) but found the Association 40% responsible for the death, and each parent 30% responsible. The trial court entered judgment for each parent in the amount of $455,000, a total of $910,000  finding each parent free of negligence to the extent of 70%. The Association concedes that this method of computing the judgment finds support in Sundstrom v. Grover, 423 So.2d 637 (Fla. 4th DCA 1982). Because of our resolution of this case, we need not consider whether we agree with Sundstrom's method of computation.
[3] Similarly inapposite to the present case is Walt Disney World Co. v. Goode, 501 So.2d 622 (Fla. 5th DCA 1986), review granted, No. 70,054 (Fla. June 25, 1987), where the court was concerned with the standard of care owed to a business invitee of a public amusement park. See also Brightwell v. Beem, 90 So.2d 320 (Fla. 1956).
[4] Ironically, the jury in the present case recommended, along with its verdict, that a six-foot chain link fence with cross arms at the top be erected and that signs be posted cautioning against swimming and warning of the water's depth.
[5] Moreover, because the evidence showed that the sharp drop in depth to 45 feet occurred some 40 to 60 feet from shore and that the depth before the drop-off was 5 1/2 feet  well over David's height  the drop-off, even if arguably a trap, could not have played any part in David's drowning.
[6] There is evidence that David had played at the swimming beach before, giving rise to the contention that he may have somehow expected the undeveloped area where he drowned to be as pleasant as the beach.
[7] It is thus apparent that there is no evidence that the lake contained a dangerous condition constituting a trap. For cases involving traps, see, e.g., Starling v. Saha, 451 So.2d 516 (Fla. 5th DCA 1984) (neighborhood child, who went into pond to swim, caught, held, and drowned by intake hose of drainage pump which was left running without supervision); Bichsel v. Blumhost, 429 S.W.2d 301 (Mo. Ct. App. 1968) (child drowned after falling into a well covered by a concrete slab that had an opening eighteen inches square, and thus constituted an ultra-hazardous pitfall); Allen v. William P. McDonald Corp., 42 So.2d 706 (Fla. 1949) (spoil banks from dredging hid steep drop into deep water and gave no warning to children playing on sand piles); Larnel Builders, Inc. v. Martin, 105 So.2d 580 (Fla. 3d DCA 1958) (same); Ansin v. Thurston, 98 So.2d 87 (Fla. 3d DCA 1957) (floating dock took child from shore out twelve feet over deep water to makeshift, tipsy raft).