753 So.2d 72 (2000)
FLORIDA DEPARTMENT OF NATURAL RESOURCES, etc., Petitioner,
v.
Juan A. GARCIA, Jr., et al., Respondents.
No. SC93065.
Supreme Court of Florida.
February 10, 2000.
*73 Bruce G. Hermelee and Sarah Helene Sharp of Hermelee & Sharp, Miami, Florida, for Petitioner.
Joel D. Eaton of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, Florida; and A. Francisco Areces of Needle, Gallagher, Areces & Ellenberg, P.A., Miami, Florida, for Respondents.
Louis F. Hubener, and Amelia L. Beisner, Assistant Attorneys General, Tallahassee, Florida, for Robert A. Butterworth, Attorney General, Amicus Curiae.
PARIENTE, J.
We accepted jurisdiction to review Garcia v. State Department of Natural Resources, 707 So.2d 1158 (Fla. 3d DCA 1998), based on express and direct conflict with Warren v. Palm Beach County, 528 So.2d 413 (Fla. 4th DCA 1988). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
Respondent, Juan Garcia, Jr., was seriously injured on February 1, 1989, when he dove into the Atlantic Ocean along the "South Beach" area of Miami Beach. See Garcia, 707 So.2d at 1159. He struck his head on debris on the ocean bottom that had allegedly been left there after the *74 demolition of the South Beach pier.[1]See id. Garcia was rendered a quadriplegic, and he and his parents sued the City of Miami Beach (the City), Metropolitan Dade County, and the Florida Department of Natural Resources (the State), among others, for negligence in failing to remove certain underwater debris at the site, and for failing to take the necessary precautions to prevent the accident.
In 1982, the State entered into a management agreement with the City allowing the City to manage South Beach. The management agreement: (1) provided that the State "holds title" to the beach property; (2) granted the City "management responsibilities" of the beach for twenty-five years; (3) required the City to submit a "management plan" providing for "the limitation and control of land and water related activities such as boating, bathing, surfing, rental of beach equipment, and sale of goods and services to the public;" and (4) required the City to pay the State twenty-five percent of revenues collected from private concessionaires. However, the State never formally designated the beach as a swimming area, nor did the State ever operate the beach as a public swimming area. The trial court granted the State's motion for summary judgment on the grounds that: (1) the State had never designated the beach as a public swimming area, and thus it had no duty of care to swimmers, and (2) even if the State owed a duty of care to the swimmers at South Beach, it had delegated the duty to the City in the management agreement.
On appeal, the Third District reversed, concluding that government entities operating a public swimming area owe a duty to operate the area safely. See Garcia, 707 So.2d at 1159. This duty of care arises whenever a "body of water [is] held out to be a public swimming area and/or commonly used by the public as a swimming area[,]" even though the body of water was never formally designated as a public swimming area by the government entity. Id. The Third District reasoned that this duty of care is nondelegable, and thus the State could not delegate the duty to the City through its management agreement. The Third District also pointed out that the decision would not impose financial hardships on the State because the management agreement contained an indemnification clause requiring the City to reimburse the State for any liability arising solely from its ownership of the beach. See id. at 1160. The Third District remanded the case for a trial.
The State initially focuses on the broad language of the Third District's opinion that could be read as imposing a duty of care to the public whenever a body of water is commonly used as a public swimming area, even if it is not formally designated as a swimming area by the State. It contends that because the State holds in public trust vast amounts of lands underlying bodies of water, the potential effect of the Third District's opinion is to make the State potentially liable for any swimming injuries occurring in these waters. The State further argues that because it never formally designated South Beach as a swimming area, or controlled the swimming area, it never assumed an operational-level duty to operate South Beach safely.
Garcia counters that South Beach is a world-renowned public swimming area. The Third District's opinion, according to Garcia, simply follows well-settled law that when a government entity operates a public swimming area, the government entity owes a duty to its invitees to maintain the premises in a reasonably safe condition, *75 and this duty cannot be delegated to others.
We address two separate issues raised by the State: (1) whether a formal designation as a public swimming area is necessary before a common law duty to maintain the swimming area in a reasonably safe condition arises; and (2) whether the district court in this case incorrectly concluded that the State could insulate itself from liability through indemnification agreements with the local government entities operating the public swimming area.

STATE'S LIABILITY FOR INJURIES IN BODIES OF WATERS
A governmental entity that operates a swimming facility "assumes the common law duty to operate the facility safely, just as a private individual is obligated under like circumstances." Avallone v. Board of County Comm'rs, 493 So.2d 1002, 1005 (Fla.1986); see Butler v. Sarasota County, 501 So.2d 579 (Fla.1986). Thus, a government entity operating a public swimming area will have the same operational-level duty to invitees as a private landownerthe duty to keep the premises in a reasonably safe condition and to warn the public of any dangerous conditions of which it knew or should have known.[2]See, e.g., Avallone, 493 So.2d at 1005; Brightwell v. Beem, 90 So.2d 320, 322 (Fla.1956); Hylazewski v. Wet `N Wild, Inc., 432 So.2d 1371, 1372 (Fla. 5th DCA 1983).
The core question presented in this case is whether a formal designation as a swimming area by the State is a prerequisite to the State's liability for breach of duty to operate the swimming facility safely, and if not, what must be shown before a duty of care to operate the swimming area safely arises. This Court's decision in Avallone did not expressly require the government entity to "designate" a public swimming area as a precondition to assuming liability for failing to operate the swimming area safely. 493 So.2d at 1005. However, the Court in Butler found the government entity to be liable because it created "a designated swimming area where the dangerous condition existed." 501 So.2d at 579. Thus, our prior cases do not squarely resolve this question.
The appellate courts addressing this issue have focused on whether the government entity held the area out to the public as a suitable place to swim, rather than relying solely on whether the government had "designated" the area for swimming. See Andrews v. Department of Natural Resources, 557 So.2d 85, 89 (Fla. 2d DCA 1990); Warren, 528 So.2d at 415. The first decision passing on this question was Warren, where the plaintiff was injured when he dove into a lake at a public park owned by a county. The Fourth District concluded that "[s]ince the county did not designate Lake Osborne as a swimming area and did not in any manner contribute to the condition of the water or the lake bottom alleged to have presented an illusion of depth, it cannot be held liable to appellant." Warren, 528 So.2d at 415. The Fourth District focused on evidence that the county had taken active steps to prohibit swimming at the park: an ordinance prohibited swimming at the park, the park rangers were instructed to discourage or prevent swimming, and there were no signs permitting swimming or diving that would lead a person to conclude that the lake had been designated as a swimming facility by the county. See id.
This analysis focusing on the totality of the circumstances is consistent with the Second District's opinion in Andrews, where a person drowned while swimming at a state park. 557 So.2d at 86. The Second District framed the "critical question" as whether the State had "designated the area where the drowning occurred as a swimming area." Id. at 88. In resolving this question, the Second District considered *76 evidence that the State knew that the section of the beach was commonly used for swimming, signs in the area permitted swimming, and the park brochure stated that swimming was permitted without designating a specific area. See id. at 89. The Second District determined that an issue of material fact existed as to whether "the state led the public to believe that Dog Beach was a designated swimming area." Id. Thus, the court in Andrews concluded that the government entity would be liable if it held an area out to the public as suitable for swimming, regardless of whether the area had been formally "designated" for swimming. Id.
In this case, although the State itself had not formally designated South Beach to be a public swimming area, there is no dispute that South Beach was held out as a public swimming area by the City. Further, the State made a conscious decision to allow South Beach to be operated as a public swimming area when it signed the management agreement with the City. The management agreement unquestionably demonstrates that the State was aware that the City would operate South Beach as a public swimming area and the State does not contend otherwise.
In fact, the State's management agreement demonstrates more than just an acquiescence by the State to allow the City to operate South Beach. The management agreement required the City to submit a management plan detailing "the limitation and control of land and water related activities such as boating, bathing, surfing, rental of beach equipment, and sale of goods and services to the public."[3] (Emphasis supplied.) Additionally, the State required the City to submit twenty-five percent of all revenues collected from private concessionaires. Therefore, the State actually derived revenue from the City's operation of South Beach.
We conclude that the fact that the State never formally "designated" the beach as a public swimming area is not dispositive of whether the government owes an operational-level duty to safely operate a public swimming area if sufficient facts exist to demonstrate that the area was held out to the public as a public swimming area. The focus of the inquiry is not whether a formal designation occurred. Rather, as in Warren and Andrews, the actions of the government entity must be examined to determine whether, based on all the circumstances, the government entity held the area out to the public as a swimming area or led the public to believe the area was a designated swimming area.
The actual operation of South Beach by the City pursuant to the management agreement between the City and the State establishes that the basis for the State's liability in this case is the State's permission to grant the City the right to operate South Beach as a swimming area open to the public. Not only did the State agree to the operation of the public swimming area, but it put limitations on the terms of the operation and demanded twenty-five percent of the revenues. Thus, the language in Garcia suggesting that the State would be considered to be operating a public swimming area if people "commonly use" the area for swimming is dicta. To the extent that the assertion that people were "commonly using" the area may be relied on as the sole basis for imposing a common law duty of care, we disapprove of this isolated statement in Garcia.
As Andrews indicates, the "common use" of an area for swimming may be one factor to consider in order to determine if a governmental entity held out the area as a public swimming area or, as in Andrews, led the public to believe that the area was designated as a swimming area. At one end of the spectrum is the circumstance where the government entity formally *77 designates an area for public swimming. At the other end of the spectrum are circumstances where either the government entity actively attempts to prohibit swimming or has no knowledge that some part of an undesignated beach is being used by swimmers.[4]
Certainly, we would agree with the State that it would be an intolerable and unnecessary burden to expect the State to post "No Swimming" signs up and down its expansive coastline on the chance that residents of the State may, on their own, select a particular area to enjoy the ocean or other waterways. On the other hand, where an area such as South Beach is a well-known public swimming area, from which the State is actively deriving profit, the State has no basis for claiming immunity from suit merely because a formal designation as a state park did not occur. Accordingly, we approve the holding of the Third District reversing the summary judgment in favor of the State, but disapprove of the broad dicta suggesting that mere common use as a swimming area by the public creates an operational-level duty requiring the State to maintain the swimming area with reasonable care.

ABILITY OF THE STATE TO SEEK INDEMNIFICATION
The State further challenges the Third District's statement that a decision to impose liability would not impose financial hardships because the management agreement contains an indemnification clause requiring the City to reimburse the State for any liability arising solely from ownership of the beach. See Garcia, 707 So.2d at 1160. According to the State, section 768.28(18), Florida Statutes (1999), precludes government entities from entering into indemnity agreements such as the management agreement. This section provides that:
Neither the state nor any agency or subdivision of the state waives any defense of sovereign immunity, or increases the limits of its liability, upon entering into a contractual relationship with another agency or subdivision of the state. Such a contract must not contain any provision that requires one party to indemnify or insure the other party for the other party's negligence or to assume any liability for the other party's negligence.

Id. (emphasis supplied).
Although no courts have construed this provision, a plain reading of the statutory language reveals that government entities are only prohibited from entering into agreements to indemnify another government entity for the other entity's negligence, or to assume any liability for the other entity's negligence. In contrast, the agreement in this case was for the City to indemnify the State for the City's own negligence. Thus, an indemnification agreement is not prohibited by this statute.
This interpretation of section 768.28(18) is also consistent with the common law right of indemnification. At common law, a nonnegligent party who is vicariously liable for the tortious actions of another can seek indemnification from the tortfeasor. See, e.g., Houdaille Indust., *78 Inc. v. Edwards, 374 So.2d 490 (Fla.1979). Therefore, at common law, the State would have been able to seek indemnity from the City if the State was without fault and held vicariously liable for the City's failure to keep South Beach reasonably safe.
Finally, with regard to the issue of the nondelegable duty raised by the dissent, the State has not challenged the Third District's statement that the landowner's duty to invitees to keep the premises reasonably safe is nondelegable. See Garcia, 707 So.2d at 1159. In fact, the State concedes that if it had first designated South Beach as a public swimming area and then turned over the operation of South Beach to the City, it could be vicariously liable. Because this matter is being reversed and remanded and neither party has raised or briefed the correctness of the Third District's statement, we decline to address the issue of the vicarious liability of a landowner.
Accordingly, we approve the Third District's decision on the grounds stated in this opinion and disapprove of the statement that "common use" by the public is the basis for imposing a common law duty of reasonable care on the State. We remand for further proceedings consistent with this opinion.
It is so ordered.
SHAW, ANSTEAD, LEWIS and QUINCE, JJ., concur.
WELLS, J., dissents with an opinion, in which HARDING, C.J., concurs.
WELLS, J., dissenting.
I dissent from the majority's decision in this case because I conclude that the majority and the Third District Court of Appeal decided this case on the wrong basis. I can agree with the majority that the determination of whether a governmental unit is operating a swimming facility should not be based entirely upon whether there has been a formal designation as a public swimming area.
However, the determination should have been made by a straightforward application of Avallone v. Board of County Commissioners, 493 So.2d 1002 (Fla.1986), in which this Court said:
A government unit has the discretionary authority to operate or not operate swimming facilities and is immune from suit on that discretionary question. However, once the unit decides to operate the swimming facility, it assumes the common law duty to operate the facility safely, just as a private individual is obligated under like circumstances.
Id. at 1005.
The key phrase in the above quotation is "decides to operate the swimming facility." In this case, it is undisputed that the State made a planning-level decision not to operate a public swimming facility at South Beach but rather to turn over operational control of this sovereignty land to the City. It is irrelevant that the State knew of, approved of, and shared in the revenues of the swimming facility. Under our holding in Avallone, the only salient fact here is that the State made an express decision not to operate a swimming facility and therefore did not waive sovereign immunity.
In my view, this simple conclusion avoids policy concerns that would emerge if, under these facts, the State were held to have waived sovereign immunity. The majority opinion exposes the State to liability for injuries to swimmers, surfers, fishermen, and boaters along hundreds of miles of beaches that are held in trust for the people of Florida. This is an unacceptable policy decision.
Moreover, I cannot agree that this factual situation is analogous to those in the cases relied upon by the Third District for the principle concerning a "nondelegable" duty. The concept of nondelegable duty is contrary to our distinction, for purposes of determining the existence of sovereign immunity, between governmental planning-level and operational-level decisions, upon *79 which Commercial Carrier v. Indian River County, 371 So.2d 1010 (Fla.1979), and its progeny are based. The proper analysis does not determine whether a governmental entity can or cannot delegate a function. Rather, the appropriate question is whether a governmental entity performed an operation itself and, if so, whether the entity exercised reasonable care. The decision as to whether to delegate control or whether to perform a particular operation is a discretionary, planning-level governmental decision into which the courts cannot intrude. Trianon Park Condominium Ass'n, Inc. v. City of Hialeah, 468 So.2d 912, 918 (Fla.1985).
Moreover, in this instance, the State's role here is similar to that of an owner, and the City's role is similar to that of a nonowner possessor such as a lessee or an independent contractor. If premises liability law were applied, there would be no liability on the part of the State, as owner, even absent a sovereign immunity bar. The Fifth District in Bovis v. 7-Eleven, Inc., 505 So.2d 661 (Fla. 5th DCA 1987), set forth the fundamental analysis of premises liability:
An owner of real property is not an insurer of the safety of persons on such property, nor is he subject to strict liability or liable per se for injuries resulting from dangerous conditions on owned property. The crux of a cause of action for premises liability is not the ownership of the premises, but the failure of the possessor of the premises to use due care (negligence) in permitting licensees and invitees to come, unwarned, to an area where, foreseeably, they may be injured by a dangerous condition which to them is not readily apparent. This is why an owner of a dangerous premises is not liable to trespassers and yet one in possession of a premises with authority to control access thereto, such as a lessee, an independent contractor, or other non-owner possessor, may be liable to invitees and licensees for injuries from dangerous conditions created by the owner, or the possessor, or by others, such as other invitees and licensees. In this case, as in the usual lease arrangement, the lessor had no right to control access by third parties to the leased premises and the lessee had actual possession and the right to control access to the leased premises and the lessee was not the agent of the lessor-owner. Therefore, the lessee and not the lessor (owner) had the continuing legal duty to inspect the premises and, in permitting or denying access to others, to act according to the safety or danger then existing. A lessor (owner) may be liable in tort to the lessee and to third persons for injuries resulting from latent dangerous conditions of which the lessor (owner) knew or should have known and which existed on the leased premises when the lessor (owner) delivered possession of the leased premises to the lessee without appropriate warnings but such liability is not based on the fact that the lessor is owner but on the basis that the owner, as possessor, can be negligent in these particulars just as any other possessor. A lessor (owner) may also be liable contractually to the lessee for damages for breach of a lease provision requiring the lessor to maintain portions of a leased premises. Of course, the lessor (owner) is not liable for injuries caused solely by the lessee's operations and activities on the leased premises. On the other hand, the lessee may not only be liable to third parties for injuries resulting from the lessee's negligent operations and activities on the leased premises but, being in possession and controlling access by licensee and invitee, may also be liable in tort for injuries to third parties caused by a dangerous condition on the leased premises, whether the dangerous condition resulted from the act of the lessee, the act of the lessor (owner), some combination of the acts of both the lessee and the lessor (owner), or the act of a third person. In summary, the duty to protect others from injury resulting from a *80 dangerous condition on a premises does not rest on legal ownership of the dangerous area but on the right to control access by third parties which right usually exists in the one in possession and control of the premises. The possessor (lessee) has the right and the duty to exclude licensees and invitees from an area that is dangerous because of dangerous operations or activities or because of a dangerous premises condition and has the duty to warn third persons of danger.
Id. at 662-63 (emphasis added; footnotes omitted).
In Miller v. Sinclair Refining Co., 268 F.2d 114 (5th Cir.1959), the federal appellate court stated:
In such a case, Florida law says that the lessor is not liable for injuries to the lessee or those upon the premises in the lessee's right unless the negligent condition which causes the injury is a violation of law, is a pre-existing defect in construction or is inherently dangerous, or unless the lessor undertakes to keep the premises in repair.
Id. at 117. In this case, the record reveals that the State, as owner, had turned over to the City, the nonowner possessor, the control of the land. It was the City that operated the swimming facility and, as possessor of the land, had the duty of keeping the premises in repair. Thus, only the City could be found liable for any injuries its negligence might have caused.
HARDING, C.J., concurs.
NOTES
[1] In March of 1988, the City of Miami Beach out an invitation to bid on a contract to remove underwater debris from the former pier site. See City of Miami Beach v. Dickerman Overseas Contracting Co., U.S.A., 659 So.2d 1106, 1108 (Fla. 3d DCA 1995) (affirming trial court's order granting summary judgment in favor of contractor where performance contract to begin work on removal of underwater debris was not finalized until after accident), review denied, 669 So.2d 251 (Fla.1996).
[2] As this case involves an invitee, we reject the State's reliance on Saga Bay Property Owners Ass'n v. Askew, 513 So.2d 691, 693 (Fla. 3d DCA 1987).
[3] Further, the State retained the right to enter the property and engage in "management activities not inconsistent with the management plan," to grant other legal uses not inconsistent with the plan and to inspect the "works and operations of the City."
[4] Of course, even if the State has not decided to operate a public swimming area, it could still face liability under certain factual circumstances. For example, if a government entity creates a hazardous condition that would not be readily apparent to the public and has knowledge of the presence of people likely to be injured by the dangerous condition, the government has a duty to either correct the condition or warn the public. See Ralph v. City of Daytona Beach, 471 So.2d 1, 3 (Fla.1983); City of St. Petersburg v. Collom, 419 So.2d 1082 (Fla.1982). This duty to warn the public of known dangerous conditions that the government entity has created would apply if the government knew an area was commonly used for swimming, regardless of whether the government entity had decided to operate a public swimming area. There may be other factual circumstances that would also give rise to liability, but we decline to discuss them at this time because that issue is not before us.