807 So.2d 676 (2001)
Joseph SELVIN, Personal Representative of the Estate of Benjamin Selvin, Appellant,
v.
DMC REGENCY RESIDENCE, LTD., a Texas limited partnership, Appellee.
No. 4D00-599.
District Court of Appeal of Florida, Fourth District.
December 19, 2001.
Rehearing Denied March 4, 2002.
*677 Joel D. Eaton of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, and Ford & Sinclair, P.A., Miami, for appellant.
Geoffrey B. Marks and G. Bart Billbrough of Cole White & Billbrough, P.A., Miami, for appellee.
FARMER, J.
Plaintiff's 93-year old father drowned in a canal behind an assisted-living facility for geriatric residents. The facility had contracted to supply him a residence and certain services. In his suit against the facility for damages, the trial court excluded any evidence of the feasibility of fencing or otherwise obstructing the canal from access by the elderly residentsmany of whom, like plaintiff's father, had diminishing cognitive and physical abilitiesas well as any reference to any issue about the canal at all. The court then granted a directed verdict. We reverse for a new trial.
Defendant agreed with decedent and his son to furnish a residence with some additional services. Although defendant offers varying degrees of attention in its services for its elderly residents, the precise level of responsibility provided the father is in dispute. While he lived in the "independent" section of the facility, plaintiff suggests *678 that the "independent section" may actually be a means to allow more assisted living residents than the regulatory law would authorize. In any case, there clearly was evidence that the father was not merely a resident but that, in addition to an apartment for his personal repose, the facility agreed to furnish certain individual services under the facility's "Personal Care Program." These included the provision and administration of medications, assistance with bathing, two meals daily and laundry services.
The evidence is not clear as to the father's cognitive and mental acuity when he first moved in. There is some evidence that it may have deteriorated over the months before his death, including testimony that the father suffered from "mild dementia." There was also considerable evidence about the location and circumstances of the canal bordering the rear parking lot of the facility. Among other things, frequent usage by the facility's residents had apparently developed a dirt path around a partial side wall ending short of the canal, which path proceeded partly along the sloping bank of the canal to a nearby flea market.
On a Saturday morning in late August, a certified nurse's assistant went to the dining room shortly after 8:30 a.m. to administer the father's medications. The assistant checked the father's apartment and several places in the building where she thought he might be, but she was unable to locate him. He did not appear for any of the meals that day and no one saw him around the premises, but no one from the facility notified the family. Later that evening the family sought to speak to him and, when he could not be found, went to the facility. They urged the personnel to report him as a missing person. Ultimately the next morning, he was found floating in the canal behind the facility's property. The cause of death was shown to be accidental drowning.
The son was appointed personal representative of his father's estate and brought an action against the assisted living facility. His complaint alleged two different causes of action: the first a statutory wrongful death action and the second based on alleged violations of statutes relating to assisted living facilities. He alleged that the facility had a common law and statutory duty to supply at least the level of services and care that all licensed assisted living facilities generally furnish elderly patients of the father's medical classification and condition. He further alleged that the facility breached that duty by failing to recognize his father's failing mental competency and notify both his son and his physician of the diminution in the father's ability to care for his own physical security; by failing to properly and continually evaluate his father's mental condition and provide increased care and attention as he deteriorated during his tenure at the facility; by failing to provide adequate custodial and supervisory care; and finally by failing to prevent his father from wandering away from the facility.
At trial plaintiff sought to show that the facility could and should have built a fence or other obstruction at the rear of its property to prevent its elderly residents, especially those with failing cognitive and mental faculties, from using the foot path to the flea market or wandering into the area of danger that the canal represented. Plaintiff also sought to present expert testimony that specific safety precautions are a recognized industry standard for adult congregate living facilities. Similarly the court precluded testimony about management's regular inspection of the facility and the issue of problems presented by the canal. All of this evidence was barred by *679 the trial judge,[1] who also instructed the jury that defendant had no duty to prevent its residents from accessing the canal area at the rear of the facility's premises.
In granting the motions in limine excluding evidence and in instructing the jury, the trial court relied on the line of cases represented by Saga Bay Property Owners Ass'n v. Askew, 513 So.2d 691 (Fla. 3d DCA 1987). In Saga Bay, the parents of a six year old child who drowned in an artificial lake near their home brought an action against the owners of the residential development in which the lake was located, alleging that the owners were negligent in failing to fence the area. The Third District held that the owners could not be held liable because "an owner of a natural or artificial body of water has no duty to fence it." 513 So.2d at 693. The court reasoned:
"The fundamental proposition that drowning is a risk inherent in any body of water leads to some equally fundamental legal principles. The owner of a body of water is not liable merely because a child may be too young or of insufficient intelligence to understand the open and obvious danger of the water; the responsibility for the care of such children remains with their parents and caretakers. To shift the responsibility to the lake ownerby virtue of ownership aloneis to unreasonably require the owner to fill the lake or fence it in order to guard against being held liable." [e.s.]
513 So.2d at 693-694; see also Navarro v. Country Village Homeowners Ass'n, 654 So.2d 167 (Fla. 3rd DCA 1995) (deep water drop-off did not constitute concealed dangerous condition and thus, under Saga Bay association could not be held liable for negligence in connection with resident's death). Similarly in Walters v. Greenglade Villas Homeowners Ass'n, Inc., 399 So.2d 538 (Fla. 3d DCA 1981), the same court held that a condominium association could not be held liable for the drowning death of a resident child in a canal bordering the common area. The court explained:
"To hold as the appellant suggests would require every landowner, who owns land adjacent to a canal in Dade County, to construct a fence or wall preventing access to the canal. We do not think that such a duty exists."
399 So.2d at 539.
This court followed Saga Bay in Scott v. Future Investments of Miami, Inc., 559 So.2d 726 (Fla. 4th DCA 1990). In Scott, the mother of a seven year old boy who drowned in a water control canal bordering the rear of her apartment complex sued the owners of the apartments for wrongful death. The canal was not owned by the owners of the apartment complex. The child's mother alleged that failure of the owner of the apartment complex "to erect a fence or provide other safety precautions next to the sandy embankment with its sudden drop-off was negligent maintenance of the complex." Relying on the Saga Bay holding that "an owner of a natural or artificial body of water has no duty to fence it," we held that "[i]f the law is such for an owner of a body of water surely the law is at least the same for a nonowner." 559 So.2d at 727. But compare Gilbertson v. Lennar Homes Inc., 629 So.2d 1029 (Fla. 4th DCA 1993) (fact question existed in action for damages from drowning death of child in lake excavated for drainage purposes in residential development; local water management district *680 regulations created duty which, if breached by developer, would give rise to cause of action for damages; and record demonstrated question of fact as to whether developer had complied with such regulations in constructing lake). Accordingly, we affirmed the trial court's ruling that the owner of the apartments had no duty to erect a fence to prevent residents' access to the canal.
Plaintiff argues that the trial court's reliance on Saga Bay and Scott is misplaced for two reasons. First, the child who drowned in the artificial lake in Saga Bay was at most a licensee, if not a trespasser, and thus the Saga Bay rule applies only to those two classifications of visitors on land, not to business invitees. Second, plaintiff reminds us, he does not contend in this case that the owner of the canal had a duty to fence the father out, as the parent argued regarding the child in Saga Bay. Rather, he contends, the assisted living facility had a duty to exercise reasonable care to keep his father into keep him safely on its own premises and thereby prevent him in his diminished mental condition from wandering off the edge of safety into the nearest and most accessible hazard, a body of water not under the control of the assisted living facility but of someone else.
It is true that Saga Bay, Walters and Scott all involve suits against owners and occupiers of land for failing to protect or warn third partieswho from time to time may be present on their landagainst known hazards. Beyond that duty to strangers as to known hazards, there is no legal relationship in Saga Bay and Walters between the third parties and the owners of the lands for the care and protection of the person lost. In Scott, the only duty assumed by the land owner was to rent an apartment for use as an ordinary residence. Thus the duty of the owners in Saga Bay, Walters and Scott was as to the public generally.
In contrast, here the duty of this assisted living facility was directed not to the general public[2] but only to those whom it permitted to live in its residential areas and for whom the facility undertook to furnish certain services of care and security. Thus, in the present case there is a special, consensual relationship between the father and this assisted living facility which did not exist in those cases. Unlike the owners in Saga Bay, Walters and Scott, the owners of this facility entered into a voluntary duty of care and protection specifically for the father, as well as the other residents of the facility. The duty was assumed ex ante, i.e. before the father took up residence at the facility. The owners knew of his specific presence on their premises as well as his need for care and protection. The owners in Saga Bay, Walters and Scott, on the contrary, had no way of knowing at any given moment who might be placing themselves in a position of danger to the risk of the body of water.
*681 There is also a fundamental distinction about the residents in assisted living facilities that is not true of the general public. Unlike people who choose to live in single family homes, the residents of this assisted living facility have their home there because they must. They have been forced by the afflictions of age, by deteriorating cognitive and mental acuity as well as physical decline, to give up their conventional homes, apartments and condominiums they had chosen as permanent places of residence when they were active and able. Now their mental and physical conditions, however, have made it necessary for their own personal safety to live in a place where trained personnel can give them care and attention to protect them from the dangers of their failing faculties. In short they have turned to assisted living facilities not in the same way that the general public chooses ordinary homes for simple shelteror to visit parks and recreation areas, but instead for protection from the ordinary risks of everyday life associated with the steady decline in their own abilities to look after themselves. What plaintiff appears to claim is that this facility failed to exercise due care in the single thingthe sole functionthat made him seek out such a facility.
The owner/operator of this facility for elderly residents in need of services chose to place it on the canal, so near to this body of water.[3] Plaintiff points out that the facility built a fence to block cars in its parking lot from rolling down the slope into the canal but it placed no barriers none suitable to the purpose, anywayto prevent its elderly residents from slipping down the banks into the water. He also argues that the danger of falling into the water was especially acute because many of these aged and infirm people might not be able to extricate themselves. He argues that the facility thus placed its particularly vulnerable residents within a foreseeable zone of danger, a risk that was admittedly not directly on their property but was surely accessible from it.
The duty of an actor whose conduct places someone in a zone of danger was explained in Kaisner v. Kolb, 543 So.2d 732 (Fla.1989):
"Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses."
543 So.2d at 735. See also McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla.1992); and Stevens v. Jefferson, 436 So.2d 33, 35 (Fla.1983). As the court added in McCain: "[t]hus, as the risk grows greater, so does the duty, because the risk to be perceived defines the duty that must be undertaken." 593 So.2d at 503.
The facility argues that as a matter of law it is freed from liability for this zone of risk because the fatherlike many of its residentsspecifically chose to retain his independence, that he wanted to be free to come and go as he saw fit. It argues that by agreement he was not bound by some of the restrictions to which more intensely supervised residents in other parts of their facility had agreed. It stresses that the canal is owned by someone else, that it should not be responsible for what happens on another person's property.
*682 Nevertheless the jury could have found from the excluded evidence, and without the erroneous jury instruction of no duty, that the facility owed him a duty of due care to protect him from the dangers represented by the canal and by accessing from its premises the footpath used as a shortcut to the flea market. How the duty of due care should be met in a given case is for the jury. As the court held in Orlando Executive Park v. Robbins, 433 So.2d 491 (Fla.1983), receded from on other grounds, Mobil Oil Corp. v. Bransford, 648 So.2d 119 (Fla.1995), "it is peculiarly a jury function to determine what precautions are reasonably required in the exercise of a particular duty of due care." 433 So.2d at 493. Thus, in Nichols v. Home Depot Inc., 541 So.2d 639, 641 (Fla. 3rd DCA 1989), the court pointed out that "[w]hat is and what is not reasonable care under the circumstances is, as a general rule, simply undeterminable as a matter of law."
The facility's argument is that the assistance it agreed to extend did not include a duty to afford protection against the danger of the canal at the very edge of its premises.[4] Yet the danger posed by the proximity of the canal for residents in the father's condition is obvious, and the need for precautions great. The canal may be off the facility's premises but that fact did not stop it from erecting a barrier to stop vehicles on its premises from rolling into it. Surely the facility is not suggesting that it assumed a duty as to cars but not for its aged tenants as to any danger from falling off the premises into the canal. As the above cases hold, the issue of the duty and what it entails in a given circumstance is for the jury. It was therefore error to keep the canal issues from the jury, just as it was error to direct a verdict, because the excluded evidence would have presented a jury question as to both the precise duty undertaken and whether it was breached.
We hold that the Saga Bay, Walters and Scott line of cases were inapposite to plaintiffs claim of a duty of due care for his father. The court's exclusion of evidence as to the canal, or the kind of things that might be done to protect these aged and impaired residents from falling into it, or industry standards as to water hazards near ACLFs, as well as the no-duty instruction, were all in error. Because the exclusion of evidence and erroneous instructions may have affected the jury's verdict on the chapter 400 claim, the new trial should extend to that claim as well. We decline to address the issue raised by the cross appeal on the award of attorney's fees because our decision at this point renders the issue premature for now.
REVERSED AND REMANDED FOR CONSISTENT PROCEEDINGS.
TAYLOR, J., and MAY, MELANIE G., Associate Judge, concur.
NOTES
[1] We are told there were at least 11 motions in limine, all apparently served as trial was beginning.
[2] Both sides spend a wealth of printer ink on the distinctions among invitees, licensees and trespassers and the varying liabilities of owners and occupiers of land under these distinctions. We have come to see this case from a different perspective, however. We focus instead on the conduct of defendant in its business of offering assisted living facilities to men and women in their declining years and the services and care that defendant has undertaken to give them. Even so, we do agree, however, that the supreme court appears to have held in Florida Department of Natural Resources v. Garcia, 753 So.2d 72 (Fla.2000), that the rule of Saga Bay does not apply to business invitees. It seems fairly obvious to us that the father is such an invitee. Certainly he is not a trespasser on the facility's property, and the agreement between them appears to give him more rights than a mere licensee.
[3] It is for that reason that the fears of the court in Walters as to every land owner are misplaced. Imposing a duty on the assisted living facility under the circumstances of this case will affect only those assisted living facilities who have placed their residents within a zone of danger without suitable protections.
[4] As to this danger and this resident, the facility seems to be arguing that they may be deemed a "living facility" but they are not an "assisted living facility." Their contention is that some aged residents, like decedent, may have agreed to take the "assisted" out of the mix of duties the facility assumes as to them. That too is a question for the jury, not for judges as a matter of law under the facts of this case.