818 So.2d 672 (2002)
Rabbi Israel POLEYEFF, as personal representative of the estate of Eugenie Poleyeff, deceased, and Frederica E. Breaux, as administratrix of the estate of Zachary Charles Breaux, deceased, Appellants,
v.
CITY OF MIAMI BEACH, Appellee.
Nos. 3D00-3536, 3D00-3405.
District Court of Appeal of Florida, Third District.
June 12, 2002.
*673 Grossman & Roth; Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, and Joel Eaton; Abramowitz & Pomerantz; and Nancy Little Hoffman, for appellants.
Holland & Knight and Daniel S. Pearson and Christopher N. Bellows; Murray Dubbin, for appellee.
Before COPE, GREEN and SORONDO, JJ.
PER CURIAM.
Rabbi Israel Poleyeff, as personal representative of the estate of Eugenie Poleyeff, and Frederica Breaux, as administratrix of the estate of Zachary Breaux, appeal from separate final summary judgments entered in favor of the City of Miami Beach.
On the authority of this Court's en banc decision in Poleyeff v. Seville Beach Hotel Corp., 782 So.2d 422 (Fla. 3d DCA 2001), review denied, Nos. 01-1227, 01-1228, 817 So.2d 849 (Fla. March 22, 2002), we hold that "an entity which does not control the area or undertake a particular responsibility to do so has no common law duty to warn, correct, or safeguard others from naturally occurring, even if hidden, dangers common to the waters in which they are found." Id. at 424.[1],[2]
Affirmed.
GREEN and SORONDO, JJ., concur.
COPE, J. (dissenting).
The majority opinion is contrary to controlling decisions of the Florida Supreme Court, and this court.

I.
These are wrongful death actions brought against the City of Miami Beach on account of two drownings. Ms. Eugenie Poleyeff, a tourist staying at a nearby hotel, went to the public beach at 29th Street. She rented a beach chair and umbrella from Hurricane Beach Rentals *674 ("Hurricane Rentals"), which is located there. Hurricane Rentals operates under a concession from the City of Miami Beach, for which the City receives revenue.
Ms. Poleyeff went swimming. She was caught in a rip tide and called for help.
Zachary Breaux, also a vacationing tourist, had likewise rented a beach chair from Hurricane Rentals and was on the beach at that time. He heard Ms. Poleyeff's cries for help. While his wife and daughter tried to find a lifeguard, Mr. Breaux went into the water to try to rescue Ms. Poleyeff. Both Ms. Poleyeff and Mr. Breaux were overcome by the rip currents and drowned.
When lifeguards arrived from the closest lifeguard station (21st Street), five other swimmers had to be rescued from the same rip currents. The lifeguards recovered Ms. Poleyeff's body from sixty yards offshore. Mr. Breaux was brought in by other swimmers.
On the day of this tragedy, the lifeguard stand at 21st Street had posted warnings regarding rip tides. There was no lifeguard stand at 29th Street, and no warnings about rip tides were posted at that location.
The estates of Ms. Poleyeff and Mr. Breaux brought separate wrongful death actions against multiple defendants. They sued the City of Miami Beach because the City controls the beach under a lease from the State of Florida. The estates alleged that the City was negligent in failing to warn swimmers of the danger of rip tides, or take other steps to safeguard those who used the beach.[3]
The City moved for summary judgment on the theory that it was entitled to sovereign immunity. The trial court granted the City's motion, and the estates have appealed.
On appeal, the City concedes that it is not entitled to sovereign immunity. However, the City argues that the summary judgment should be affirmed on the alternative theory that it owed no legal duty to the decedents to warn them, or otherwise take measures to protect them, from naturally occurring conditions in the water.

II.
It is undisputed that the City controls this part of the beach. As the Florida Supreme Court has explained:
In 1982, the State entered into a management agreement with the City [of Miami Beach] allowing the City to manage South Beach. The management agreement: (1) provided that the State "holds title" to the beach property; (2) granted the City "management responsibilities" of the beach for twenty-five years; (3) required the City to submit a "management plan" providing for "the limitation and control of land and water related activities such as boating, bathing, surfing, rental of beach equipment, and sale of goods and services to the public;" and (4) required the City to pay the State twenty-five percent of revenues collected from private concessionaires.
*675 Florida Dept. of Natural Resources v. Garcia, 753 So.2d 72, 74 (Fla.2000) (emphasis in original).
The City entered into a concession agreement with Hurricane Rentals which allowed Hurricane Rentals to operate a rental stand at 29th Street. Hurricane Rentals had a Tiki hut from which it rented beach lounges, umbrellas, water craft, and beach equipment. The City receives revenue from Hurricane Rentals' operations. See id. at 76.
The City built facilities at the 29th Street location for the use of swimmers and other beachgoers. The facilities included public showers, restrooms, drinking fountains, and parking. The City provided access to the beach from its boardwalk.
The City was well aware that beachgoers swam at this and other concession stand locations. The City has promulgated rules and regulations for beachfront concession operations. Where, as here, the concessionaire is renting watercraft, the regulations require a separation of the swimming area from the access channel used by the water craft.[4]
In Florida Dept. of Natural Resources v. Garcia, the court considered the liability of the State for an in-water accident on South Beach. In that case the plaintiff was a swimmer who had been injured on submerged construction debris. The court considered the exact area of beach which is at issue in the case now before us. In Garcia, as in the present case, there had been no formal designation by the state or local government of the beach as a swimming area.
The Florida Supreme Court said:
A governmental entity that operates a swimming facility "assumes the common law duty to operate the facility safely, just as a private individual is obligated under like circumstances." Avallone v. Board of County Comm'rs, 493 So.2d *676 1002, 1005 (Fla.1986); see Butler v. Sarasota County, 501 So.2d 579 (Fla.1986). Thus, a government entity operating a public swimming area will have the same operational-level duty to invitees as a private landownerthe duty to keep the premises in a reasonably safe condition and to warn the public of any dangerous conditions of which it knew or should have known. See e.g., Avallone, 493 So.2d at 1005; Brightwell v. Beem, 90 So.2d 320, 322 (Fla.1956); Hylazewski v. Wet'N Wild, Inc., 432 So.2d 1371, 1372 (Fla. 5th DCA 1983).
The core question presented in this case is whether a formal designation as a swimming area by the State is a prerequisite to the State's liability for breach of duty to operate the swimming facility safely, and if not, what must be shown before a duty of care to operate the swimming area safely arises. This Court's decision in Avallone did not expressly require the government entity to "designate" a public swimming area as a precondition to assuming liability for failing to operate the swimming area safely. 493 So.2d at 1005. However, the Court in Butler found the government entity to be liable because it created "a designated swimming area where the dangerous condition existed." 501 So.2d at 579. Thus, our prior cases do not squarely resolve this question.
The appellate courts addressing this issue have focused on whether the government entity held the area out to the public as a suitable place to swim, rather than relying solely on whether the government had "designated" the area for swimming....
. . . .
In this case, although the State itself had not formally designated South Beach to be a public swimming area, there is no dispute that South Beach was held out as a public swimming area by the City. Further, the State made a conscious decision to allow South Beach to be operated as a public swimming area when it signed the management agreement with the City. The management agreement unquestionably demonstrates that the State was aware that the City would operate South Beach as a public swimming area and the State does not contend otherwise.
In fact, the State's management agreement demonstrates more than just an acquiescence by the State to allow the City to operate South Beach. The management agreement required the City to submit a management plan detailing "the limitation and control of land and water related activities such as boating, bathing, surfing, rental of beach equipment, and sale of goods and services to the public." (Emphasis supplied). Additionally, the State required the City to submit twenty-five percent of all revenues collected from private concessionaires. Therefore, the State actually derived revenue from the City's operation of South Beach.
We conclude that the fact that the State never formally "designated" the beach as a public swimming area is not dispositive of whether the government owes an operational-level duty to safely operate a public swimming area if sufficient facts exist to demonstrate that the area was held out to the public as a public swimming area. The focus of the inquiry is not whether a formal designation occurred. Rather, as in Warren and Andrews[ v. Dept. of Natural Resources, 557 So.2d 85, 89 (Fla. 2d DCA 1990)], the actions of the government entity must be examined to determine whether, based on all the circumstances, the government entity held the area out to the public as a swimming area or led *677 the public to believe the area was a designated swimming area.
. . . .
Certainly, we would agree with the State that it would be an intolerable and unnecessary burden to expect the State to post "No Swimming" signs up and down its expansive coastline on the chance that residents of the State may, on their own, select a particular area to enjoy the ocean or other waterways. On the other hand, where an area such as South Beach is a well-known public swimming area, from which the State is actively deriving profit, the State has no basis for claiming immunity from suit merely because a formal designation as a state park did not occur.
753 So.2d at 75-77 (some emphasis in original, some emphasis added).
In this case, the question is the liability of the City rather than the State, but it is the same beach and the same management agreement. The same principles apply.
As stated in the Garcia opinion, this is a well known public swimming area. Under the agreement with the State, the City was required to do a management plan for land and water related activities, including swimming. Id.
As relates to the 29th Street location, the City entered into a concession agreement with Hurricane Rentals to provide beach and water equipment. The City obtained income from that rental activity. The City contemplated that there would be swimmers congregating at the concession stand locations, because the City's rules require the concessionaire to provide an access channel for water craft which is clearly separated by a line of buoys from the swimming area. The City provided showers, restrooms, and parking in the vicinity.
Plainly the City is operating a swimming facility within the meaning of Garcia. Indeed, after Garcia there is no room left for the City to make a contrary argument. The City thus has a duty to use due care to operate the swimming area safely, as stated in Garcia. Id. at 75.

III.
The City argues that it has no duty to warn, or take other action, to protect swimmers from naturally occurring conditions in the water. This argument is contrary to clearly controlling Florida Supreme Court precedent.
To reiterate the law as stated in Garcia:
A governmental entity that operates a swimming facility "assumes the common law duty to operate the facility safely, just as a private individual is obligated under like circumstances." Thus, a government entity operating a public swimming area will have the same operational-level duty to invitees as a private landownerthe duty to keep the premises in a reasonably safe condition and to warn the public of any dangerous conditions of which it knew or should have known.
753 So.2d at 75 (citations omitted).
The City argues that the Garcia case should be distinguished because it involves submerged construction debris left over from the demolition of a pier. The City acknowledges that a duty of care exists with respect to a manmade submerged object, which was the situation existing in Garcia.
The City contends, however, that there is no duty to warn, or take other precautions, with respect to a naturally occurring condition in the ocean, such as rip tides. This argument has already been rejected by the Florida Supreme Court.
*678 In Sarasota County v. Butler, 476 So.2d 216 (Fla. 2d DCA 1985), quashed, Butler v. Sarasota County, 501 So.2d 579 (1986), the nine-year-old decedent went swimming at South Lido Beach in Sarasota County. The decedent
drowned and his body was recovered the next day. The record indicates that the tides and currents were strong and the underlying lands contained drop-offs. The complaint alleged that Sarasota County was negligent because it failed to post warning signs or other warning devices alerting beach-goers to the dangerous conditions, failed to provide lifeguards or other protection and failed to provide safety or rescue equipment to be used in emergencies. Such omissions were alleged as the proximate cause of the decedent's death.
476 So.2d at 216-17. The Second District reversed a jury verdict in favor of the estate of the child, saying that the County was entitled to sovereign immunity.
The Florida Supreme Court reversed, ruling that once the County had decided to operate the area as a swimming facility, it had assumed the "`common law duty to operate the facility safely just as a private individual is obligated under like circumstances.'" Butler v. Sarasota County, 501 So.2d at 579 (citations omitted). The court explained that "[i]n this instance, the public owner did not create the specific dangerous condition but did create a designated swimming area where the dangerous condition existed." Id. (emphasis added).
The only dangerous conditions identified in that case were strong currents and drop-offs in the underlying land. Obviously these are naturally occurring conditions in the waters adjacent to the beach. That is the situation now before us.
In Butler, Chief Justice McDonald dissented saying that "[g]overnmental entities should not be liable for naturally occurring dangerous conditions in bodies of waters adjacent to public beaches." 501 So.2d at 580. That argumentwhich is the City's argument in the present casewas rejected by the Butler majority.
When Butler and Garcia are read together, it is clear that under controlling Florida Supreme Court precedent, the summary judgment in this case must be reversed. The City is operating a well known swimming beach. The plaintiffs' claim is that the risk of rip tides in that area was well known to the City, and that the City failed to use due care to warn of dangerous conditions or otherwise keep the premises reasonably safe. The City posted no warning signs regarding rip currents and did not establish a lifeguard standeven though the City was actively receiving revenues from Hurricane Rentals at that location. An affirmance of the summary judgment in favor of the City is simply not permissible under the controlling supreme court decisions cited above.

IV.
The City's entire position in this appeal is based on a portion of this court's en banc opinion in Poleyeff v. Seville Beach Hotel Corp., 782 So.2d 422 (Fla. 3d DCA 2001) (en banc). The actual holding of that case has been previously stated:
As in Adika [v. Beekman Towers, Inc., 633 So.2d 1170 (Fla. 3d DCA 1994)], we hold that an entity which does not control the area or undertake a particular responsibility to do so has no common law duty to warn, correct, or safeguard others from naturally occurring, even if hidden, dangers common to the waters in which they are found.
782 So.2d at 424 (footnotes omitted). As explained earlier in this opinion, the City does control this particular area and, for *679 that matter, has also undertaken a particular responsibility to do so under its agreement with the State of Florida. The Poleyeff opinion also stated:
It is enough to say that drowning because of a natural characteristic of the very waters in which it occurs is simply one of the perhaps rapidly diminishing set of circumstances for which, without more, no human being or entity should be considered "to blame," deemed "at fault" or, therefore, held civilly liable. While the law of torts may properly serve to distribute risks among those whom society, speaking through the courts, holds responsible for a particular unwelcome event, it should not be employed to assign faultwith the result that the transfer of money is required when none can be fairly said to exist. In this instance, in other words, because there is no wrong, there can be no remedy. See Penelas v. Arms Technology, Inc., 778 So.2d 1042 (Fla. 3d DCA 2001). It has also been said that
[a] common law duty exists when a court says it does because it thinks it should.

Schuster v. Banco De Iberoamerica, S.A., 476 So.2d 253, 254, 255 (Fla. 3d DCA 1985) (majority and dissenting opinions). Adika reflected our belief that the duties for which the plaintiffs so ably contend should not be recognized. We still feel that way.
782 So.2d at 425-26.
The City reads this passage (which is dictum) as saying that under no circumstances can itor anyone else, for that matterbe held liable for a naturally occurring condition in the water. But as the context of the passage indicates, this court was discussing the liability of hotel owners whose hotels adjoined, or were near, the beach. The neighboring hotel owners neither controlled the beach nor had otherwise undertaken a particular responsibility to do so.
In any event, there are Florida Supreme Court decisions squarely on the point. Our earlier Poleyeff decision must be interpreted in a way which harmonizes with the applicable Florida Supreme Court decisions.
The summary judgment must therefore be reversed.
NOTES
[1] The facts in the present case are accurately set forth in this Court's first Poleyeff opinion, and in part I of Judge Cope's dissent herein.
[2] We reiterate our agreement with the dictum in our first Poleyeff opinion, "that drowning because of a natural characteristic of the very waters in which it occurs is simply one of the perhaps rapidly diminishing set of circumstances for which, without more, no human being or entity should be considered "to blame," deemed "at fault" or, therefore, held civilly liable. While the law of torts may properly serve to distribute risks among those whom society, speaking through the courts, holds responsible for a particular unwelcome event, it should not be employed to assign faultwith the result that the transfer of money is requiredwhen none can be fairly said to exist. In this instance, in other words, because there is no wrong, there can be no remedy." Id. at 425.
[3] The estates also sued the hotels at which the decedents stayed (the Seville Hotel and Saxony Hotel) as well as Hurricane Rentals, contending that they should have warned the decedents about the dangers of rip currents. Summary judgments for those entities were affirmed by this court because "an entity which does not control the area or undertake a particular responsibility to do so has no common law duty to warn, correct, or safeguard others from naturally occurring, even if hidden, dangers common to the waters in which they are found." Poleyeff v. Seville Beach Hotel Corp., 782 So.2d at 422, 424 (Fla. 3d DCA 2001) (en banc)(footnotes omitted).
[4] The rules and regulations state, in part:

17. The following are particular regulations which apply to Concessionaires offering Water Recreational Equipment:
. . . .
B. All rental operations of water craft must have a "chase boat" available....
C. The operation of all water sport activity should be outside the 300 foot swimming area ("guarded area") and no closer than 400 feet to the nearest lifeguard stand(s). The location of beachfront operations shall be subject to the approval of appropriate City Departments. The Concessionaire must instruct renters in safety precautions to avoid contact with swimmers beachfront.
. . . .
E. Concessionaires are responsible for instructing clients on safe operation of equipment including advisement to stay away from "guarded area."
F. The "guarded area" is to include 300' east of the shoreline or 100' from the nearest bather.
G. The Concessionaire must identify, through a channel marked by removable buoys, an access route through which renters of water recreational equipment may leave the beachfront and enter open water. The marked channel shall extend 300 ft. perpendicular to the shore line and must be marked with orange buoys, a minimum of 18 inches in diameter, four (4) on each side of the channel, equally spaced.
. . . .
Q. All water sports concessions must be approved by the City's Marine Authority and by the City Manager or his designee.
. . . .
23. The City also reserves the right to revoke a Concessionaire's license(s) due to noncompliance with the Rules and Regulations herein specified.
Rules and Regulations for Beachfront Concession Operations (R. 262-64).