899 So.2d 1059 (2005)
Frederica E. BREAUX, etc., Petitioner,
v.
CITY OF MIAMI BEACH, Respondent,
Rabbi Israel Poleyeff, etc., Petitioner,
v.
City of Miami Beach, Respondent.
Nos. SC02-1568, SC02-1569.
Supreme Court of Florida.
March 24, 2005.
*1061 Nancy Little Hoffmann, Pompano Beach, Florida and Howard L. Pomerantz of Abramowitz and Pomerantz, P.A., Sunrise, Florida on behalf of Frederica E. Breaux, etc.; and Joel D. Eaton of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin and Perwin, P.A., Miami, Florida on behalf of Rabbi Israel Poleyeff, etc., for Petitioner.
Christopher N. Bellows and Daniel S. Pearson of Holland and Knight, Miami, Florida, and Murray H. Dubbin, City of Attorney, Miami Beach, Florida on behalf of City of Miami Beach, for Respondent.
Edward G. Guedes of Weiss, Serota, Helfman, Pastoriza, Guedes, Cole and Boniske, P.A., Miami, Florida on behalf of Village of Key Biscayne and Bal Harbour Village; John C. Dellagloria, City Attorney, North Miami, Florida, Stephen H. Cypen, Town Attorney, Miami Beach, Florida, and Lynn M. Dannheisser, City Attorney, Sunny Isles Beach, Florida on behalf of City of North Miami and Town of Surfside, As Amici Curiae.
*1060 PARIENTE, C.J.
We have for review the Third District Court of Appeal's decision in Poleyeff v. City of Miami Beach, 818 So.2d 672 (Fla. 3d DCA 2002) (Poleyeff II), which expressly and directly conflicts with this Court's decision in Florida Department of Natural Resources v. Garcia, 753 So.2d 72 (Fla.2000).[1] We hold that when a municipality, such as the City of Miami Beach, operates a public beach as a swimming area by having public restrooms, showers, water fountains, parking, and a beach concessionaire from which it derives revenues, the municipality has a duty to exercise reasonable care under the circumstances to those foreseeable users of that swimming area. This holding is based on our longstanding and well-settled precedent addressing governmental entities that operate public swimming areas. We make no determination about whether the City of Miami Beach was negligent or whether any such negligence was the legal cause of the plaintiffs' damages. Nor do we determine what effect, if any, the principle of comparative negligence has on the plaintiffs' claims. Moreover, we note that as with all governmental entities, the City's liability is limited by the cap in the State's waiver of sovereign immunity set forth in section 768.28, Florida Statutes (2004).[2] *1062 Accordingly, we quash the Third District's decision and remand for further proceedings.

FACTS AND PROCEDURAL HISTORY
On February 20, 1997, Eugenie Poleyeff and her husband, who were guests at the Saxony Hotel in Miami Beach, walked three blocks to the beach area behind the Seville Hotel at 29th Street to rent a beach chair and umbrella from a concessionaire, Hurricane Beach Rentals. While swimming in the Atlantic Ocean adjacent to the 29th Street beach area, Ms. Poleyeff was caught in rip currents. Upon hearing Ms. Poleyeff's calls for help, Zachary Breaux, who was a guest at the Seville, attempted to save her. Tragically, they were both overcome by the rip currents and drowned.
The estates of Ms. Poleyeff and Mr. Breaux brought wrongful death actions against multiple defendants, including the City of Miami Beach, the Seville Hotel, the Saxony Hotel, and Hurricane Beach Rentals. The trial court dismissed the complaints against the Seville Hotel, the Saxony Hotel, and Hurricane Beach Rentals with prejudice, and the Third District affirmed. See Poleyeff v. Seville Beach Hotel Corp., 782 So.2d 422 (Fla. 3d DCA 2001) (Poleyeff I), review denied, 817 So.2d 849 (Fla.2002).
With regard to the City, the complaints alleged that the City controlled the beach under a lease agreement with the State of Florida and was negligent in failing to warn swimmers of the danger of rip currents or take other action to safeguard swimmers who used the beach. The City filed a motion for summary judgment, arguing that it was entitled to sovereign immunity.
The record contains evidence that the City was aware that the public was using the beach area at 29th Street for swimming. The Poleyeffs saw other people swimming and wading in the ocean, and believed the area was a swimming area. The Poleyeffs saw no signs warning that the area was not a swimming area or that there were no lifeguards in the area. Similarly, the Breaux family saw many people swimming there on that day and the previous day, and believed the area was a swimming area.
Evidence was also presented to the trial court that at the 29th Street beach area, the City provided public restrooms with showers, water fountains, telephones, and picnic tables, and that there was metered parking adjacent to the beach on 29th Street. In addition, the City licensed Hurricane Beach Rentals to operate at that location. Hurricane Beach Rentals rented to beach users a variety of equipment, including lounge chairs, umbrellas, and watercraft. The City required the concessionaire and its employees to wear identification badges issued or approved by the City.
Although the City provided lifeguards at various other locations along the beach, at the time of the accident the beach area at 29th Street did not have a lifeguard station. The City's Parks and Recreation Director testified during a deposition that the 29th Street beach area was the only beach area that had public restrooms, showers, water fountains, and a beach concessionaire but not also a lifeguard station.
At those beaches where the City provided lifeguards, the public was warned of rip currents in the area. On the day of the accident, the lifeguard at the 21st Street beach area, which is eight blocks from the 29th Street beach area where the decedents were swimming, posted rip current warning flags.
*1063 The trial court granted the City's motion for summary judgment, finding that the City was immune from suit, and the estates appealed to the Third District. The district court affirmed the trial court's grant of summary judgment, but not on the basis of sovereign immunity. Instead, relying exclusively on its prior en banc decision in Poleyeff I, the Third District held that the City had no duty to warn the decedents of, or safeguard them from, the naturally occurring rip currents because it did "not control the area or undertake a particular responsibility to do so." Poleyeff II, 818 So.2d at 673 (quoting Poleyeff I, 782 So.2d at 424). This holding conflicts with Garcia, both on the issue of the City's control of the beach area and on the issue of whether the City was operating a swimming area so that a duty of reasonable care arose.

ANALYSIS
We begin by resolving the conflict between the Third District's decision in this case and Garcia on the issue of control of the beach area. The Third District affirmed the trial court's order granting the City summary judgment on the authority of its en banc decision in Poleyeff I. In that case, the district court concluded that the Seville Hotel, the Saxony Hotel and Hurricane Beach Rentals had no "duty to warn, correct, or safeguard others from naturally occurring, even if hidden, dangers common to the waters in which they are found" because they did "not control the area or undertake a particular responsibility to do so." Poleyeff I, 782 So.2d at 424 (footnotes omitted).
Unlike the hotels and concessionaire dismissed as defendants in Poleyeff I, the City does control the area of Miami Beach, based upon a 1982 management agreement with the State. As we explained in Garcia,
[t]he management agreement: (1) provided that the State "holds title" to the beach property; (2) granted the City "management responsibilities" of the beach for twenty-five years; (3) required the City to submit a "management plan" providing for "the limitation and control of land and water related activities such as boating, bathing, surfing, rental of beach equipment, and sale of goods and services to the public;" and (4) required the City to pay the State twenty-five percent of revenues collected from private concessionaires.
753 So.2d at 74. We therefore conclude that the Third District erred to the extent it held that the City does not control the beach of Miami Beach.
We next turn to the issues of duty and sovereign immunity. In cases involving governmental tort liability, we generally determine whether the defendant owes a duty of care to the plaintiff before we address whether the governmental entity is immune from liability. See Henderson v. Bowden, 737 So.2d 532, 535 (Fla.1999) ("A threshold matter is whether the [defendant] had a duty to act with care toward the decedents.... Assuming a duty is owed, we must then determine whether sovereign immunity bars an action for an alleged breach of that duty."); Kaisner v. Kolb, 543 So.2d 732, 734 (Fla.1989) ("Conceptually, the question of the applicability of ... immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity.") (quoting Williams v. State, 34 Cal.3d 18, 192 Cal. Rptr. 233, 664 P.2d 137, 139 (1983)). However, in cases that involve injuries suffered while swimming, the issues of duty and sovereign immunity merge because the determination of both questions turns on the same inquiry  whether the governmental *1064 entity was operating a public swimming area when the accident occurred. We have explained that
[a] government unit has the discretionary authority to operate or not operate swimming facilities and is immune from suit on that discretionary question. However, once the unit decides to operate the swimming facility, it assumes the common law duty to operate the facility safely, just as a private individual is obligated under like circumstances.
Avallone v. Board of County Comm'rs, 493 So.2d 1002, 1005 (Fla.1986); see also Butler v. Sarasota County, 501 So.2d 579, 579 (Fla.1986) (quoting Avallone). This duty includes "keep[ing] the premises in a reasonably safe condition and ... warn[ing] the public of any dangerous conditions of which [the governmental entity] knew or should have known." Garcia, 753 So.2d at 75.[3]
On the issue of whether a governmental entity is operating a public swimming area, Garcia held
that the fact that the [governmental entity] never formally "designated" the beach as a public swimming area is not dispositive of whether the government owes an operational-level duty[[4]] to safely operate a public swimming area if sufficient facts exist to demonstrate that the area was held out to the public as a public swimming area. The focus of the inquiry is not whether a formal designation occurred. Rather, ... the actions of the government entity must be examined to determine whether, based on all the circumstances, the government entity held the area out to the public as a swimming area or led the public to believe the area was a designated swimming area.

....
... [T]he "common use" of an area for swimming may be one factor to consider in order to determine if a governmental entity held out the area as a public swimming area or, as in Andrews [v. Department of Natural Resources, 557 So.2d 85 (Fla. 2d DCA 1990)], led the public to believe that the area was designated as a swimming area. At one end of the spectrum is the circumstance where the government entity formally designates an area for public swimming. At the other end of the spectrum are circumstances where either the government entity actively attempts to prohibit swimming or has no knowledge that some part of an undesignated beach is being used by swimmers.
753 So.2d at 76-77 (emphasis supplied).
Although the facts presented in Garcia are different from the facts of this case, the general principle of law Garcia established is applicable to all cases dealing with governmental tort liability for swimming accidents. If "the government[al] entity held the area out to the public as a swimming area or led the public to believe the area was a designated swimming area," the governmental entity owes an operational-level duty of care to those using the swimming area. Garcia, 753 So.2d at 76.
*1065 In concluding that the City was not operating a swimming area at the 29th Street beach location, the dissent narrowly focuses on the city council's decision not to formally designate the area for swimming or post lifeguards there. However, under Garcia these facts are not dispositive. Indeed, Garcia expressly rejected the requirement of formal designation, see 753 So.2d at 76 ("The focus of the inquiry is not whether a formal designation occurred."), and relying on the presence of a lifeguard station as a litmus test for establishing a public swimming area is even more exacting than requiring "formal designation." Instead, we must consider all of the circumstances to determine whether the City was operating a swimming area at the 29th Street beach location.
We conclude that the totality of the circumstances in this case demonstrates that the City was operating a "public swimming area" at the 29th Street location. The City knew that the public was using this location for swimming. There were no signs warning the public not to swim and both the Poleyeff family and the Breaux family saw people using the area for swimming. Moreover, although the City did not have a lifeguard station at the 29th Street beach area, the City built beach facilities at this location and provided metered parking at the end of 29th Street. Of even greater significance, the City licensed a concessionaire to rent beach chairs, umbrellas, and watercraft at this location, thereby deriving revenue from the public's use of this particular beach area.
Thus, contrary to the dissent's assertion, it is not the City's decision to open the beach to the public that creates the duty in this case. See dissenting op. at 1071-72. The City did more at the 29th Street location than simply allowing access to the water. By providing parking, public facilities, and concessions, the City created more than just a "chance that residents of the State may, on their own, select" the 29th Street location "to enjoy the ocean." Garcia, 753 So.2d at 77. In fact, at the time of the drownings, the 29th Street beach area was the only beach area along Miami Beach that had public restrooms, showers, water fountains, and a beach concessionaire, but had not been formally designated a swimming area by the City.
Under the analysis we set forth in Garcia, we conclude the City "held the [the 29th Street beach] area out to the public as a swimming area or led the public to believe the area was a designated swimming area." Id. at 76. The City therefore had an operational-level duty of care "to warn the public of any dangerous conditions of which it knew or should have known" at the 29th Street beach area. Id. at 75.[5]
In reaching this conclusion, we expressly disagree with the Third District's statement that "drowning because of a natural characteristic of the very waters in which it occurs is simply one of the perhaps rapidly diminishing set of circumstances for which, without more, no human being or entity should be ... held civilly liable." Poleyeff II, 818 So.2d at 673 n. 2 (quoting Poleyeff I, 782 So.2d at 425). Rather, we agree with Judge Cope's conclusion that *1066 the City's argument "that it has no duty to warn ... [of] naturally occurring conditions in the water" is contrary to our controlling precedent in Garcia. Id. at 677 (Cope, J., dissenting). The analysis set forth in Garcia is not limited to man-made dangers. Garcia cites with approval the Second District Court of Appeal's decision in Andrews, which involved natural dangerous currents. See Garcia, 753 So.2d at 75-76. Moreover, as noted by Judge Cope, in Butler, which is also cited with approval in Garcia, a majority of this Court rejected Chief Justice McDonald's assertion that "[g]overnmental entities should not be liable for naturally occurring dangerous conditions in bodies of water adjacent to public beaches." Butler, 501 So.2d at 580 (McDonald, C.J., dissenting), quoted in Poleyeff II, 818 So.2d at 678 (Cope, J., dissenting).
Lastly, the fact that rip currents are transient in nature is not dispositive on the issue of the City's duty to warn. Under Garcia, the focus is not on the nature of the dangerous condition but on whether the governmental entity knew or should have known of the dangerous condition. Whether the City knew or should have known of the dangerous rip currents at the 29th Street beach location on the day of the accident is an issue of fact to be decided by a jury.
Evidence was presented to the trial court that most people do not know the danger that rip currents pose, that the presence of rip currents is not obvious to the untrained observer, and that people tend to enter the water where a rip current exists because the water looks calmer than the surrounding area. Further, on the day that the decedents were killed, the City's lifeguard at the 21st Street beach identified rip currents at that location and posted a warning flag. Thus, the City warned beachgoers at a nearby location of a known dangerous condition while neglecting to similarly warn beachgoers at the 29th Street beach where the same condition existed. Considering the evidence in the record, the question of the City's actual or imputed knowledge regarding rip currents at the 29th Street beach area raises genuine issues of material fact not properly decided as a matter of law.

CONCLUSION
We hold that based on the undisputed facts, the City controls the beach area and was operating a public swimming area at the 29th Street location at the time of the accident. Thus, the City had a duty of care to warn of dangers that were known or should have been known, and is not shielded from liability as a matter of law based on sovereign immunity. We expressly do not decide the issues of whether the City knew or should have known of the rip currents at the 29th Street location on the day the decedents drowned or whether the City breached its duty of care to the decedents. Nor do we decide any issues regarding causation or damages. We quash the Third District's decision in Poleyeff II and remand for further proceedings not inconsistent with this opinion.
It is so ordered.
ANSTEAD, LEWIS, and QUINCE, JJ., concur.
LEWIS, J., concurs with an opinion, in which PARIENTE, C.J., and ANSTEAD, J., concur.
WELLS, J., dissents with an opinion, in which CANTERO, and BELL, JJ., concur.
LEWIS, J., concurring.
While I fully concur in the majority opinion, I write separately to address the legitimate concerns and issues presented *1067 by the dissent that have been considered in the past and cannot be simply lightly disregarded today. Importantly, the rule of law utilized by the majority today to recognize that the City of Miami Beach is subject to the same duty that would be applied to a private entity with regard to operational aspects of a swimming area at the 29th Street beach location is not at all new or novel and has actually been a part of Florida jurisprudence since the 1940s. See Ide v. City of St. Cloud, 150 Fla. 806, 8 So.2d 924, 925 (1942) (determining that when a city maintains a bathing beach pursuant to its charter power, it is held to the same degree of care to ensure the safety of those invited to the beach as a private person). The majority's discussion today relies upon the Court's most recent articulation of that rule in Florida Department of Natural Resources v. Garcia, 753 So.2d 72 (Fla.2000). The dissent seeks to distinguish Garcia from the instant matter on the basis that the injury in Garcia was caused by an artificial condition (debris left on the ocean bottom after destruction of a South Beach pier), whereas the drownings in the instant matter resulted from rip currents, a natural transient danger inherent in the ocean. There is a factual difference in the controlling precedent; however, such difference does not require or support a distinction with regard to the existence of an underlying duty.
This Court considered a factual scenario almost identical to that presented in the instant matter in the 1986 case of Butler v. Sarasota County, 501 So.2d 579 (Fla.1986). There, Sarasota County controlled an area known as South Lido Beach, and had improved and maintained the area as one open for swimming activity. See Sarasota County v. Butler, 476 So.2d 216, 216 (Fla. 2d DCA 1985), quashed, 501 So.2d 579 (Fla.1986). A nine-year-old boy drowned at the beach due to strong currents and a naturally occurring drop-off in the ocean floor. See id. The complaint alleged that Sarasota County was negligent in failing to post warning signs or other devices alerting beachgoers to the dangerous conditions, failing to provide lifeguards or other protection, and failing to provide safety rescue equipment. See id. at 217. In a brief opinion, this Court quashed the district court decision which had held that the county possessed sovereign immunity in the operation of the swimming area. Relying on Avallone v. Board of County Commissioners, 493 So.2d 1002 (Fla.1986), this Court stated:
The duty of care is no different for a public owner than a private owner. In this instance, the public owner did not create the specific dangerous condition but did create a designated swimming area where the dangerous condition existed.
Butler, 501 So.2d at 579.
Then Chief Justice McDonald dissented from the majority opinion in Butler, positing many of the same arguments offered by the dissent today, including that a governmental entity's responsibility should be limited to those conditions of the water that result from improvements or changes it has made, and should not extend to variable circumstances which are not under its control. See id. at 580 (McDonald, C.J., dissenting). Thus, even in the face of many of the same arguments advanced by the dissent today, this Court nearly twenty years ago determined that the harmony between public and private entities in the existence of a duty with regard to such swimming areas applies even in matters involving injury attributable to natural, transient water conditions such as that presented here.
In my view, the dissent overstates the holding and scope of the majority opinion for purposes of expressing discord. For I, *1068 too, would dissent if the majority opinion had the effect of requiring governmental entities to post lifeguards at points of open beach not effectively or formally designated as swimming areas, to survey thousands of miles of ocean bottom adjacent to such beaches to discover and make safe hazardous conditions, or to protect any individual entering the water from any point along Florida's thousands of miles of coastline against the numerous transient hazards existing in the ocean water. I would also dissent if the majority opinion cast aside traditional notions of comparative negligence and assumption of risk that engender equity in the resolution of tort claims in this state. However, the decision of the majority today neither compels nor even contemplates such outcomes.
The dissent also fails to adequately account for the commercial nexus between the City of Miami Beach and the beach area located at 29th Street. The concessionaire licensed to operate at the beach area offered for rent beach chairs, umbrellas, and watercraftnot items unrelated to water sport activities that may be offered for sale along any Miami Beach city street. The City also had installed bathroom facilities complete with showers at this location. Such facilities serve a specific purposeto draw beachgoers to this spot and to enable them to change into their swimming clothes and to rinse or cleanse after swimming in the ocean. Such public bathing facilities and rental activities are notably absent from general inland commercial and shopping districts such as the popular Lincoln Road, which do not serve as portals to Florida's coastal waters nor to draw beachgoers. As underscored by these facts, this is not a case in which the duty of the City of Miami Beach stems from the mere fact that the City has beaches and coastline within its geographical bounds or that access is open to all. Here, the City engaged in affirmative actions that effectively designated the beach located at 29th Street as a public swimming area and derived revenue from that activity. It is from that activity of designating this swimming area that the source of the government's duty arises.
As noted by the dissent, a few other states have established different principles which govern the underlying duty of public entities with regard to the operation of swimming areas. Public entities in California apparently do not have a duty to provide safe beaches or warn beachgoers of natural hazards such as breaking waves and uneven ocean floors. See Lupash v. City of Seal Beach, 75 Cal.App.4th 1428, 89 Cal.Rptr.2d 920 (1999). In Lupash, a 13-year-old boy was rendered a quadriplegic when he fell after stepping into a depression in the ocean floor during a junior lifeguard competition, and an adverse final summary judgment that was entered against him in an action against the City was upheld. See id. at 922.
However, Lupash and other similar California cases have little persuasive impact in the current Florida context because the California jurisprudence concerning the duty of public entities with regard to swimming areas is informed by the California Tort Claims Act, which specifically provides absolute immunity for public entities against claims for injuries caused by the natural condition of unimproved public property, including, but not limited to, any natural condition of any lake, stream, bay, river, or beach. See id. at 925 n. 3 (stating that the statutory immunities "buttress" the court's conclusion regarding duty); see also Arroyo v. State, 34 Cal.App.4th 755, 40 Cal.Rptr.2d 627 (1995) (holding that statutory immunity created an exception to the general duty to warn of known dangerous conditions such as mountain lions in hiking areas even where the State had distributed brochures indicating the area *1069 was free from significant dangers and posted warning signs concerning the existence of snakes and ticks). The California courts have interpreted the absolute immunity with regard to wild and unimproved public property very broadly, and have determined that such immunity applies notwithstanding the presence or absence of lifeguards, warning signs, or other public safety services, see City of Santa Cruz v. Superior Court, 198 Cal.App.3d 999, 244 Cal.Rptr. 105 (1988), or the placement of such amenities as restrooms, lifeguard towers, fire circles, food concessions, promenades, parking lots and piers. See Geffen v. Los Angeles, 197 Cal.App.3d 188, 242 Cal.Rptr. 492 (1987). Florida law does not and has not contained a similar provision granting absolute immunity for natural conditions of wild and unimproved public property, and certainly not with regard to the operation of areas involved in for-profit activities.
The dissent also refers to a New York decision, Herman v. State, 94 A.D.2d 161, 463 N.Y.S.2d 501 (1983), in which the court held that the State did not have a duty to post signs warning beachgoers of the presence of sandbars. The New York court recognized that a public entity could be held liable for the failure to warn when the entity creates or substantially contributes to the creation of a hazardous condition, or in situations in which naturally occurring hazards are fixed and susceptible to remedy or isolation from the public. See id. at 502 (citing cases imposing a duty to warn of dangerous cliffs, falling rocks, submerged rocks on a lake bottom, and fixed drop-offs on a lake bottom). However, the court determined that such standards did not impose a duty to warn of the existence of sandbars, which may change location within hours and are impossible to monitor. See id.
However, like the California decisions, the New York result has little application here. The matter before the Court today involves the City of Miami Beach failing to provide any warning of the danger posed by rip currents or to take any safety precaution whatsoever in this area. While the transience of some natural dangers may and should certainly inform and shape the standard of care necessary to adequately dispatch one's duty under these circumstances, it cannotconsistent with long-established Florida jurisprudencetotally negate the existence of that duty, nor is absolute immunity afforded for a breach of that duty. The majority's decision today will not have the effect of imposing onerous burdens on local governments that will reduce the public's access to beaches in this state. This decision has absolutely no impact on the thousands of miles of open beach access coasts even if they extend through local government areas. To the contrary, the majority's decision simply recognizes that a duty arises in these designated swimming areas and beachgoers will benefit from that reasonable conduct required in these areas.
PARIENTE, C.J., and ANSTEAD, J., concur.
WELLS, J., dissenting.
I dissent because I conclude that the majority's decision is an erroneous extension of this Court's decision in Florida Department of Natural Resources v. Garcia, 753 So.2d 72 (Fla.2000), is in conflict with this Court's long-standing precedent in respect to sovereign immunity, and will have serious adverse consequences for the State, county, and municipal beach areas of Florida.
The present case is substantially factually distinct from Garcia, and the legal analysis should recognize that difference. Garcia was injured when he dove into the *1070 ocean adjacent to an area of Miami Beach in which the City of Miami Beach (City) had demolished a pier. Garcia struck his head on the debris on the ocean bottom that remained after the demolition. Thus, Garcia's case involved an injury resulting from a known stationary hazard which the City had created in an area controlled and operated by the City as a swimming area. There was a lifeguard stationed by the City in the area. In Garcia, there was no issue raised as to whether the City had decided to operate the area as a swimming area. The issues which were before the Court and which were for decision by the Court in Garcia were about the liability of the State of Floridanot the liability of the City of Miami Beach. Id. at 75. The majority opinion in Garcia states that the core question presented was whether "a formal designation as a swimming area by the State [was] a prerequisite to the State's liability." Id. at 75.
In the present case, rather than the injury resulting from a known stationary hazard created by the governmental entity, the deaths were caused by a natural transient danger inherent in the ocean. The area of the ocean where the deaths occurred had in no way been changed or improved by the City, and the area was in no way marked off or otherwise designated as a swimming area. There is no evidence in the record showing that the City had "decided" to operate the area as a swimming area. The City had not posted a lifeguard in the area, a fact which was open and obvious. What the City had done was to allow the public to enter the ocean through the entirety of the beach area which the City controlled, but the City had not improved or changed the ocean bottom or marked the 29th Street area for swimming. The core question in this case did not involve whether there was "a formal designation of a swimming area"; the question was whether the City had "decided to operate and was operating" a swimming area in the particular area of Miami Beach where the drownings occurred and could be held liable in tort for transient natural hazards in the ocean.
Garcia cites to, as does the present majority opinion, this Court's 1986 case concerning a governmental entity's liability for an injury in a swimming area, Avallone v. Board of County Commissioners, 493 So.2d 1002 (Fla.1986). Avallone was a case in which the injury occurred when Avallone was pushed from a dock at a public park and swimming area that was owned and operated by Citrus County. The basis of Avallone's claim against the county was the failure of the county to provide supervisory personnel at the park. In its opinion in Avallone, this Court based it decision on its earlier landmark sovereign immunity decision in Trianon Park Condominium Ass'n v. City of Hialeah, 468 So.2d 912 (Fla.1985), and stated:
Section 768.28 and Cauley v. City of Jacksonville, 403 So.2d 379 (Fla.1981), abolished the distinction which once existed between municipalities and counties. The common law duty which [Pickett v. City of Jacksonville, 155 Fla. 439, 20 So.2d 484 (1945),] and [Ide v. City of St. Cloud, 150 Fla. 806, 8 So.2d 924 (1942),] recognized was also applicable to counties even though the counties were sovereignly immune from suit at the time Pickett and Ide issued. We addressed this point in Trianon Park when we emphasized "that section 768.28, Florida Statutes (1975), which waived sovereign immunity, created no new cause of action, but merely eliminated the immunity which prevented recovery for common law torts committed by the government." Trianon Park, 468 So.2d at 914. A government unit has the discretionary authority to operate or not operate swimming facilities and is *1071 immune from suit on that discretionary question. However, once the unit decides to operate the swimming facility, it assumes the common law duty to operate the facility safely, just as a private individual is obligated under like circumstances.
Avallone, 493 So.2d at 1005. I agree with the majority that in this holding in Avallone, we held that a governmental entity operating a swimming facility has a common law duty to users of the swimming facility. However, the key threshold to the existence of this operational-level duty is that the governmental entity made a discretionary decision to operate a swimming facility and is operating a swimming facility.
As stated earlier, the record in this case does not show that the City had made the decision that the ocean adjacent to the 29th Street area was to be a swimming area. The Miami Beach City Council made the decision that the entire length of the City's beach would be open to the public, and it would not prohibit the public from having access to the ocean through its beaches. The 29th Street area was simply an area within that decision. Included in the record of this case are the depositions of Kevin Smith, the Director of Parks and Recreation for the City of Miami Beach, Vincent Andreano, the Captain of the City of Miami Beach Patrol, and William Morrison and James Krupka, who were both lifeguards for the City. The record shows that the City provided lifeguards at various station locations on the beach. Decisions as to the number and placement of lifeguard stations were also made by the vote of the Miami Beach City Council upon the recommendations of the Director of Parks and Recreation and the Captain of the Beach Patrol. On February 20, 1997, the City had lifeguard stations at the Sunshine Pier beach area and at 1st, 3rd, 6th, 8th, 10th, 12th, 13th, 14th, 17th, 21st, 35th, 46th, 53rd, 64th, 72nd, 79th, 81st, and 83rd Streets. A lifeguard could guard approximately 500 yards of beach front250 yards on either side of the lifeguard station. But because of budgeting constraints, a lifeguard could not be placed on every five hundred yards along the entirety of the City's beaches. On the date of the drownings, the City Council had neither put a lifeguard station at the 29th Street area nor decided that the ocean adjacent to this area of beach was to be treated as a swimming area. The City had not changed or improved the ocean or ocean bottom in this area. The City had in no way marked the area for swimming.
The decision as to the number and placement of lifeguards has budgeting implications which are plainly legislative in nature. See Dennis v. City of Tampa, 581 So.2d 1345 (Fla. 2nd DCA 1991); City of Daytona Beach v. Palmer, 469 So.2d 121 (Fla.1985); Wong v. City of Miami, 237 So.2d 132 (Fla.1970). Such decisions are not the basis for governmental tort liability. Dep't of Health & Rehab. Servs. v. B.J.M., 656 So.2d 906, 911 (Fla.1995). On the basis of these record facts, the majority's decision reduces to a holding that by the City's opening of the entire length of the beach to the public, the City was operating a swimming area for the entire length of the beach.
The majority does place emphasis on the City providing public restrooms in the 29th Street area and licensing concessionaries in the area, with the implication being that this made this area into a swimming area. However, it simply does not follow that the providing of these public conveniences equates to a decision by the City to operate a swimming area in the ocean adjacent to the restrooms. The restrooms have been in this place since the middle of the last century, and there is no indication in *1072 the present record that when they were long ago constructed, the City had decided to make the water adjacent to this area of beach any different than the unimproved areas of water along the entire beach.
The concurring opinion cites to two cases in support of liability on the part of the City: Ide v. City of St. Cloud, 150 Fla. 806, 8 So.2d 924 (1942); and Butler v. Sarasota County, 501 So.2d 579 (Fla.1986). However, I believe those cases highlight why the present situation of Miami Beach opening its entire beach to the public is different from the swimming liability cases in which this Court has held that the governmental entity could have liability for operating a swimming facility.
The facts of Ide, as set forth in the opinion, were:
The substance of the declaration was that defendant maintained a bathing beach outside the city limits; that for some time the city had knowingly allowed a deep hole out in the lake to remain hidden and unguarded; that the city had invited the general public on the premises and plaintiff's husband and minor son entered in response to the invitation and were drowned by reason of the city's negligence aforesaid.
8 So.2d at 925. As is seen, the City of St. Cloud's liability was from the operation of a beach area for swimming at a lake in which there was a known stationary hazard. I simply have to conclude the factual difference is self-evident, as is the logic of there being a duty on the part of St. Cloud to warn of the hole which it knew existed at the time and place of the Ide drownings and there not being a duty on the part of Miami Beach to warn of transient rip tides which the City did not know were existent at the time and place of the drownings in this case.
Butler was a case in which the drownings occurred in an area which had been marked for swimming. Both the majority and concurring opinions here fasten upon the statement by Justice McDonald in his dissent that "[g]overnmental entities should not be liable for naturally occurring dangerous conditions in bodies of water adjacent to public beaches." 501 So.2d at 580 (McDonald, C.J., dissenting), as indicating that in Butler this Court concluded that governmental entities have liability for naturally occurring conditions. However, in focusing upon what Justice McDonald said, the majority and concurring opinions overlook the point of what this Court actually held in Butler, which was:
In this instance, the public owner did not create the specific dangerous condition but did create a designated swimming area where the dangerous condition existed.

501 So.2d at 579 (emphasis added). Unlike the circumstances of the present case, in Butler there was a specific swimming area where the currents and the bottom combined and were known to be dangers. When Sarasota County created the swimming area at that particular location, it had a duty to warn of the known hazard which existed at that location. Again, I believe the distinction in the duty of the governmental entities in the two situations is self-evident.
I cannot agree with the majority that the fact that these deaths resulted from a transient natural hazard makes no difference in the City's liability. Florida is unique in the broad expanse of beaches that it has adjacent to the Atlantic Ocean and the Gulf of Mexico. We have hundreds of miles of beaches adjacent to these waters. These beaches are within state, county, and municipal areas. Throughout the history of Florida dating to 1845, there has been an emphasis on these beaches being open to the public so that the public can freely swim, fish, sunbathe, and engage *1073 in general recreation. Miami Beach, by opening to the public for free the entire length of the beach under that City's control, followed what I believe to be an exceedingly beneficial tradition and service.
The majority appears to attempt to minimize its holding by first stating, "We make no determination about whether the City of Miami Beach was negligent or whether any such negligence was the legal cause of the plaintiffs' damages." Majority op. at 1061. However, this statement does not withstand the scrutiny of the present record. The present record makes clear that the only way the City could have reasonably safeguarded the plaintiffs' decedents would have been to have placed a lifeguard at the location where the drownings occurred. Candidly, the majority's present holding is that the City had the duty to protect against the transient rip currents, and since it did not provide the only reasonable safeguard against the rip currents, the City breached its duty. The damages resulted from the drownings in the riptides, and therefore the City was negligent. The majority's statement obfuscates that the issue here is not an issue of factthe issue here is an issue of law, i.e., whether the City had the duty to place a lifeguard at the location where the drownings occurred. The majority cannot avoid that the effect of its holding is that the discretionary decision by the City Council not to place a lifeguard at 29th Street was negligent.
The majority secondly attempts to minimize its holding by stating, "[W]e note that as with all governmental entities, the City's liability is limited by the cap in the State's waiver of sovereign immunity provisions set forth in section 768.28, Florida Statutes (2004)." Majority op. at 1061. I read this to mean that the City's financial exposure is not of great financial consequence to the City since section 768.28(5) limits the payment of claims to $100,000 per individual and $200,000 per incident. However, this is incorrect. As then Judge Pariente wrote for the Fourth District Court of Appeal in Paushter v. South Broward Hospital District, 664 So.2d 1032, 1033 (Fla. 4th DCA 1996):
However, while section 768.28(5) limits recovery against a governmental entity absent a claims bill, it does not limit the right of a party to proceed to judgment for the full amount of damages against the state or its agencies.
The City's financial exposure is great under these circumstances.
Rather than exposing Florida's governmental entities where our beaches are located to tort liability, this Court should respect that the ocean and gulf waters adjacent to these beaches are filled with natural dangers which are controlled only by nature and that these dangers are simply inherent in the use of these waters. There are sharks, barracudas, stingrays, jelly fish, undertows, riptides, sandbars, coral reefs, lightning, and literally thousands of other natural dangers. Courts in other states with extensive beaches have recognized that there can be no tort recovery against the government from injuries caused by these natural transitory dangers in the ocean. Lupash v. City of Seal Beach, 75 Cal.App.4th 1428, 89 Cal.Rptr.2d 920, 926 (1999) (ocean can have high points, low points, riptides, rip currents, swirls, splashing waves, sand crabs, driftwood, seashells, and all kinds of danger, and there is no duty to protect anyone against these dangers.); Herman v. State, 94 A.D.2d 161, 463 N.Y.S.2d 501 (N.Y.App. Div.1983) (no duty to protect against shifting sandbars). In Garcia, this Court acknowledged this by stating:
[I]t would be an intolerable and unnecessary burden to expect the State to post "No Swimming" signs up and down *1074 its expansive coastline on the chance that residents of the State may, on their own, select a particular area to enjoy the ocean or other waterways.
Garcia, 753 So.2d at 77.
To hold a governmental entity liable for hazards it creates or hazards which are stationary in an area where the government puts a park is one thing. It is wholly different to make the government liable for transient natural hazards in the ocean or gulf.
Unfortunately, the result of placing this burden of liability on the governmental entities in which Florida's beaches are located will predictably result in seriously reducing public access to beaches because governmental entities conclude that they cannot practically or financially afford to protect users against the unlimited natural hazards of the ocean or gulf. Certainly, a foreseeable consequence of this decision will be the closing of public restrooms and public concessions[6] in areas in which the governmental entity makes a budgetary decision not to place lifeguards. I believe this is a very bad result for Florida and for the public.
The tragedies of these deaths were unfathomable, and I in no way wish to diminish the extent of those tragedies. But I must dissent to the majority's holding that the City could have liability for the deaths.
CANTERO and BELL, JJ., concur.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
[2] The Legislature has set a cap on damages recoverable from a governmental entity at $100,000 per person and $200,000 per accident. See § 768.28(5), Fla. Stat. (2004). So, although a judgment may be obtained for a larger amount, the statutory caps make it impossible, absent a special claims bill passed by the Legislature, for a claimant to collect more than the caps provide.
[3] This is the duty an owner or controller of property owes an invitee. See Garcia, 753 So.2d at 75. An invitee "is a licensee on the premises by invitation, either express or reasonably implied, of the owner or controller of the property." Barrio v. City of Miami Beach, 698 So.2d 1241, 1243 (Fla. 3d DCA 1997).
[4] We have distinguished between a governmental entity's "planning-level" activities, which are immune from suit, and a governmental entity's "operational-level" activities, which are subject to traditional tort liability. See Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1021 (Fla.1979).
[5] Although an operator of a swimming area also generally has a duty to keep the premises in a reasonably safe condition, see Garcia, 753 So.2d at 75, we conclude that this applies only to the extent the premises are improved or maintained by the operator. An operator cannot be charged with keeping an unaltered natural body of water "safe" because a natural body of water contains inherent natural hazards. The natural character of a hazard does not, however, relieve the operator of the duty to warn if it knew or should have known the hazard was present.
[6] The majority and concurring opinions' finding of great significance the City's deriving of revenue from the beach rentals appears to me to be a very weak basis upon which to justify a basis for liability. The licensing of concessions by the City is primarily in order to regulate the concessions in the interest of the public. There is no claim here that the drownings were related to the use of any rentals or that by allowing a concessionaire to be at the 29th Street area that the City decided that area was a "swimming area" different than other areas of water adjacent to the entire length of beach.